IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| FIRST OPTION EMS,<br>    *Plaintiff*, | §<br>§<br>§ |
| v. | §   Civil Action No. 3:13−cv−00277 |
| | § |
| MEDICAL TRANSPORTATION<br>MANAGEMENT, INC.,<br>    *Defendant*, | §<br>§<br>§ |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case was tried by consent of the parties in a bench trial before the Court. Plaintiff First Option EMS and Defendant Medical Transportation Management, Inc. appeared by and through their counsel of record. The Court, having carefully considered the evidence admitted at trial and the stipulations made on the record during the trial, now makes the following findings of fact and conclusions of law.

### I. FINDINGS OF FACT

1. Defendant Medical Transportation Management, Inc. ("MTM") is a Missouri Corporation. MTM is engaged in the business of managing a network of medical transportation service companies to deliver non-emergency medical transportation services. MTM has a contract with the Texas Health and Human Services Commission ("THHSC") to arrange for non-emergency transports of Medicaid patients in Texas.

1

2. Plaintiff First Option EMS ("First Option") is a medical transportation company based in Katy, Texas, and First Option is owned and operated by Mr. Okezie N. Uleanya.

3. In early 2012, MTM and First Option began discussing a commercial relationship in which First Option would operate as a subcontractor to MTM, and would provide transportation services as requested by MTM.

4. In March 2012, MTM and First Option entered into a one-year agreement entitled "Medical Transportation Services Agreement" (the "Agreement"). The Vice President of Paratransit Operations for MTM, whose signature is illegible, signed the main body of the Agreement on March 13, 2012. Mr. Uleyana signed the main body of Agreement on behalf of First Option on March 14, 2012. The Agreement contained several attachments that, as discussed below, were signed by the parties on various dates.

5. The Agreement's effective date was "March 15, 2012," and it had a one-year term. Either party could terminate the Agreement by giving the other a 30-day written notice.

6. The Agreement contained a merger clause stating, "The Agreement constitutes the entire understanding of the parties hereto, and no changes, amendments or alterations, except as otherwise noted herein, shall be effective unless signed by both parties."

7. Under the Agreement, First Option also agreed that, in the event it failed to comply with "each and every term of [the] Agreement or otherwise is in breach of any

2

term of this Agreement," then First Option "shall pay all of MTM's costs and litigation expenses, including reasonable attorneys fees that may be incurred by MTM."

8.  The Agreement contained several very specific provisions regarding the obligations of First Option EMS. Under the Agreement, First Option agreed to transport Medicaid patients in particular service areas and under particular conditions, including providing appropriately trained and licensed drivers and providing vehicles that met the requirements of the American with Disabilities Act of 1990. First Option also agreed to "comply with the MTM Medical Transportation Provider Guidelines and Quality Improvement Program ('Guidelines')."

9.  The Agreement required First Option to seek payment from MTM by submitting itemized reports, listing the services that it had provided and the charge per service. Further, First Option was required to provide, "for each trip, the requisite passenger and driver signatures and contain all required documentation (see Appendix E, Transportation Provider Guidelines) and be in proper order in all respects as a precondition to receiving payment from MTM for such services." First Option was to submit this documentation "contemporaneously with the submission of the claim," and MTM had the right to reject untimely documentation. Under the Agreement, First Option waived its right to seek payment for any claims that were older than 90 days.

10. The Agreement also required First Option to "maintain all records pertaining to services provided under this Agreement for a period of eleven (11) years, or such longer period as may be provided by applicable laws and regulations."

11. Schedule A to the Agreement listed specific rates per mile for a particular ZIP Code and particular types of transport. Two versions of "Schedule A" were submitted to the Court. The earliest version of Schedule A is signed by a representative of MTM, on March 13, 2012, and by Mr. Uleanya, on February 29, 2012. For ambulatory patients in "Base Location 77583," Schedule A states a rate of 12.50/flat for miles 0 through 5, and 1.50/mile for miles 6 through 200. There is no rate specified in the column entitled "Unloaded Rate." For paralift (non-ambulatory) patients, the rate from miles 0 through 5 was 24.50/flat, and 1.65/mile from mile 6 though mile 200. Again, no rate was specified in the column titled "Unloaded Rate." The second, later, version of Schedule contains an additional zip code as a "Base Location," pays higher rates in that second location, and provides .40/mile as an "Unloaded Rate" in both locations for miles 31 through 200. This document bears a signature from Mr. Uleya, dated March 10, 2012, but it does not bear a counter-signature from any MTM representative.

12. The Agreement's Schedule B is a table of "Liquidated Damages," listing sixteen types of fines that First Option would be assessed for certain violations of the Agreement. For example, First Option's "[u]se of a driver in 'Pending Approval' or 'Expired' status or any type of clerical error" would result in a fine of "$25.00 per driver per calendar day, or any portion thereof." Similarly, the fine for failing to deliver or pick up a passenger on time was $10.00 per occurrence. Schedule B was signed by MTM on March 12, 2012, and countersigned by First Option on March 14, 2012.

13. Before each trip, MTM would send First Option trip information, including the trip number, the patient's name, the calculated mileage between travel points, and the price it would be paid for the service. After First Option performed a trip, it would seek payment by electronically submitting the supporting paper work to MTM via a "portal" computer program.

14. After First Option submitted its claims for payment, MTM verified the claim information against MTM's own records, and transferred approved claims into the MTM payment system. MTM verified information such as the name of the driver who performed the services, the last five digits of the vehicle VIN number used, and whether the trip log submitted by First Option contained the required signatures of the transported client and the driver. If the submitted trip information was not in accordance with MTM Guidelines, then "Liquidated Damages" would be charged against First Option.

15. First Option performed trips for MTM from mid-March 2012 through December 28, 2012.

16. For a significant number of the trips it performed, First Option failed to upload supporting documentation that included signatures of both the driver and passenger. MTM denied payment for these claims. From March 2012 through December 2012, MTM denied $108,414.02 in claims due to First Option's failure to provide required signatures.

17. MTM also denied payment for trips that did not include a passenger, on the grounds that Schedule A of the Agreement did not allow for payment for "Unloaded Mileage."

18. MTM also assessed "Liquidated Damages" against First Option for First Option's numerous, repeated violations of the Agreement and Schedule B. MTM kept a running log of these "Liquidated Damages", and First Option incurred over $14,640.90 in "Liquidated Damages" under the Agreement.

19. On July 7, 2012, First Option sent MTM a letter seeking payment for claims that MTM had denied. Further, First Option contended that the Schedule A in effect provided a payment rate for "Unloaded Mileage" and it sought payment for past trips at those rates.

20. On October 11, 2012, MTM notified First Option that it was terminating the Agreement, without cause, effective November 14, 2012.

21. On October 24, 2012, MTM sent a second letter to First Option, this time stating that it was terminating the Agreement, effective immediately, for cause.

22. Despite the letters of termination, in November and December 2012, MTM personnel sent First Option a series of trip requests. First Option performed these trips, submitted claims for payment, and was paid for these trips.

23. In January 2013, First Option's attorneys sent a demand letter to MTM, contending that MTM owed First Option $111,688.10—$30,000 for unpaid "Unloaded Mileage" claims, and $81,688.10 for claims that First Option alleged had been underpaid or improperly denied by MTM.

24. At trial, MTM's attorney testified that MTM had incurred $ 53,030.32 for its reasonable attorneys' fees and costs in litigation before this Court, and that it would incur an additional $25,000 in attorneys' fees if this case was appealed to the United

6

States Court of Appeals for the Fifth Circuit, plus $5,000 if the case was appealed to United States Supreme Court and a petition for certiorari was granted, and an additional $10,000 if the United States Supreme Court called for briefing.

## II. CONCLUSIONS OF LAW

The Court makes the following conclusions of law:

### A. Applicable Law

23. Because the parties are citizens of different States, and the matter in controversy exceeds $75,000, this Court has jurisdiction over the subject matter and the parties to this lawsuit under 28 U.S.C. § 1332(a).

### B. Liability

#### i. Breach of Contract.

24. Under Texas law, "[t]he essential elements of a breach of contract action are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Smith Int'l., Inc. v. Egle Group, LLC*, 490 F.3d 380, 387 (5th Cir. 2007).

25. The Court concludes that there was a valid contract between MTM and First Option, and that the first version of Schedule A—the only version in evidence that was signed by both parties—provided the applicable rates for payment.

26. The Court concludes that First Option failed to comply with all of the conditions precedent to payment under the Agreement, and that First Option is not

7

entitled to payment for trips for which it failed to timely provide supporting documentation and signatures required by the Agreement.

27. The Court concludes that First Option has failed to establish that MTM breached the Agreement.

28. The Court concludes that MTM has established that First Option breached the Agreement by failing to fulfill all of the requirements set out in the Agreement and the incorporated Guidelines.

29. The Court concludes that First Option's failure to fulfill all of the requirements listed in the Agreement and the Guidelines was a breach of the Agreement.

30. The Court concludes that MTM has established that First Option failed to pay the full amount of "Liquidated Damages" that it was assessed under the Agreement. MTM presented evidence that it is owed $14,640.90 in "Liquidated Damages," and First Option neither has neither alleged nor established that it had paid any of the "Liquidated Damages" for which MTM seeks payment.

31. The Court concludes that First Option's failure to pay these "Liquidated Damages" was a breach of the Agreement.

    ii.    **Unjust Enrichment/Quantum Meruit.**

32. Quantum meruit is a theory of recovery based on principles of unjust enrichment. *Bashara v. Baptist Mem'l Hosp. Sys.*, 685 S.W.2d 307, 310 (Tex. 1985). The elements of quantum meruit are that: (1) plaintiff rendered valuable services or materials; (2) the services were rendered to the defendant; (3) the defendant accepted, used, and enjoyed the services and materials; and (4) the circumstances reasonably

notified the defendant that the plaintiff expected compensation for the services or materials. *Id.*

33. "Unjust enrichment claims are based on quasi-contract." *Fortune Production Co. v. Conoco, Inc.* 52 S.W.3d 671, 683 (Tex. 2000). "Generally speaking, when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory . . . . When a valid agreement already addresses the matter, recovery under an equitable theory is generally inconsistent with the express agreement." *Id.* at 684.

34. The Court concludes that First Option has not established that it is entitled to recover for any unjust enrichment or quantum meruit claims against MTM.

35. **C.    Damages**

   **i.    Breach of Contract.**

36. The Court concludes that MTM is entitled to and shall recover damages in the amount of $14,640.90, ***plus prejudgment interest.***

37. The Court concludes that MTM is entitled to and shall recover, under the Agreement, its reasonable attorneys' fees and costs in the amount of $ 53,030.32 for its reasonable attorneys' fees and costs in litigation before this Court, and plus an additional $25,000 in attorneys' fees if this case is appealed to the United States Court of Appeals for the Fifth Circuit, plus $5,000 if the case is appealed to United States Supreme Court and a petition for certiorari is granted, and an additional $10,000 if the United States Supreme Court calls for briefing.

38. Any of the foregoing findings of fact that contains conclusions of law shall be deemed to be conclusions of law, and any of the foregoing conclusions of law that contain conclusions of fact shall be deemed to be findings of fact.

**IT IS SO ORDERED.**

SIGNED AT **GALVESTON, TEXAS**, on July 13 2015.

_____
GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE